| 7 | 321 |
| 48 | 365 |

# I. Clement Camp v. The Church Wardens of the Church of St. Louis and J. P. Kirwan.

The Wardens of the Church of St. Louis employed *Kirwan* to rebuild the cathedral, under the direction and superintendence of their architect, according to plans agreed upon. *Kirwan* employed the plaintiff as his master bricklayer. Owing to some defect in the plan, work or materials, and without any fault of plaintiff, a tower fell and inflicted on him a severe injury. He sued both *Kirwan* and the Church Wardens for damages, and a jury rendered a verdict against defendants, *in solido*, for $2500. On appeal, the verdict was sustained.

The general rule of law is, that a principal is liable to third persons for the torts, neglects and omissions of duty of his agent, in the course of his employment.

Those provisions of law which render the owner of a building liable for the damage occasioned by its ruin, resulting from a vice in its original construction, or from neglect to repair it, are entirely independent of the general rules concerning the responsibilities of masters and employers; they are evidently founded in an enlightened view of public necessity; they protect the neighbor and the passenger in the street, and it would be singular, indeed. if the men at work on the building were excluded from their just and salutary operation. Per *Eustis*, C. J.

In an ordinary case, where a landholder makes a contract with an undertaker to erect buildings on his land, and in the performance of the work, by the undertaker, an accident occurs to an individual, whether a passer by or a person laboring at work; the landholder who has not resumed possession, and who has used reasonable diligence to select a discreet and competent undertaker, is not answerable to the person injured. Whatever responsibility there may be for such accident, is thrown upon the undertaker, by the article 2739 of the Civil Code.

But, where the landowner retains a continuous and active direction and control over the work, he is answerable for an injury sustained by a workman, in consequence of its defectiveness. Per *Slidell*, J.

The responsibility which articles 2299 and 2302 create against the master and house-owner, is of the same nature and degree. As a general rule, under these articles, the master and house-owner are alike responsible for slight neglect.

The plaintiff having been employed as master mason, by the contractor, *Kirwan*, stands towards the house-owners and contractor as if he had been employed by themselves. They were bound only to use ordinary diligence in the selection of their architect and their builder; and as the men selected had been long engaged in those pursuits, and had the reputation of being persons every way competent to the task, due diligence was used; an action, therefore, cannot be maintained against them.

A master is not responsible to his servant, for an injury sustained by such servant, in consequence of the negligence of a fellow servant, provided the servant injured was, at the time, acting in his master's service, and the servant causing the injury was a person of ordinary skill and care. Per *Rost*, J., *Preston*, J., concurring.

APPEAL from the Second District Court of New Orleans, *Lea*, J.

*Cyprien Dufour* and *P. C. Cuvellier*, for plaintiff. The plaintiff contends that both defendants are responsible, jointly and *in solido*, unto him, for the damage which he has suffered, and he bases his action upon the following propositions: 1. Every act whatever of man that causes damage to another, obliges him by whose fault it happened, to repair it. C. C. La. art. 2294. C. N. art. 1382. 2. Every person is responsible for the damage he occasions, not merely by his act, but by his negligence, his imprudence or his want of skill. C. C. La. art. 2295. C. N. art. 1383. 3. We are responsible not only for the damage occasioned by our own acts, but for that which is caused by the act of persons for whom we are responsible, or of things which we have in our custody. C. C.

CAMP
*v.*
THE WARDENS
OF THE CHURCH
OF ST. LOUIS.

La. art. 2296. Masters and employers are answerable for the damages occasioned by their servants and overseers, in the exercise of the functions in which they are employed. C. C. La. art. 2299. C. N. art. 1384. 4. The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction. C. C. La. art. 2302. C. N. art. 1386. 5. Corporations are bound by the acts of their agents, when these do not exceed the limits of the administration which it entrusted to them. C. C. La. art. 430.

In addition to the articles herein cited, the counsel for plaintiff beg leave to call the court's attention to the following list of authorities: Toullier, liv. 3. tit. 4. Des engagements qui se forment sans convention. Domat, Lois Civiles, liv. 2, tit. 8. Delvincourt, tome 2, p. 452. Dalloz, *verbo* Responsabilité. Duranton, tome 13, No. 729. Malleville, sur l'article 1386. Favard, *verbo* Delits and quasi Delits. Pothier, Obligations, No. 116 à 453. Starkie on Evidence, *verbo* Nuisance. Merlin Réportoire *verbo* Quasi, 10. Ib. Dommage. Journal du Palais, vol. 10 (1812) page 908. Power — c. — Moreau. As to the measure of damages the counsel refer to : Greenleaf on Evidence vol. 2, *verbo* Damage ; to the case of *Brown* v. *Ponchartrain Railroad Company*, 8 R. R. 45, and to the case of *Carnatz* v. *The Mexican Gulf Railroad Company*, lately decided by this honorable court and not yet reported.

*Durant* and *Roselius*, for *Kirwan*. What was the relation of the parties in this suit. The Church Wardens were the owners, and the employers of *Kirwan*, directing and binding him to build their cathedral under the superintendence of *Depouilly*, architect. *Camp*, plaintiff, was employed by *Kirwan*. Now, admitting that, under the legal principle here laid down, *Kirwan* is liable for all damages caused by the act of *Camp* in discharging the duties of a bricklayer, to whom is he liable ? What does the law mean ? Why, clearly, that he is liable to third parties for the injuries *Camp* may do to them, but not to *Camp* for the injuries he may do to himself. Under this principle of law, it must be contended that *Kirwan* is liable either for the act of *Camp* or that of *Depouilly* ; but if *Camp* chooses to pull the tower down on his own head while *Kirwan* is away, why should *Kirwan* suffer for it in payment to *Camp*, when *Kirwan* knew nothing of what *Cmmp* was about, and himself suffers severely in the loss of his money, materials and contract ?

*Wigmore* v. *Jay*, see Boston Law Reporter for December, 1850, pp. 380, 393, 394 : " A party who had contracted to erect a building, employed some bricklayers for the purpose, and it being his duty to provide the proper scaffolding, entrusted the care of this to his foreman. The foreman having used bad material in the construction of the scaffolding, it broke, and one of the bricklayers was killed : Held, that in the absence of proof, that the foreman was a person deficient in skill or improper to employ for that purpose, no action, under the 9 and 10 Vic., c. 93, was maintainable by the personal representative of the party killed against the common employer."

*Benjamin* and *Micou*, for the Church Wardens.

The court was equally divided in opinion.

EUSTIS, C. J. The plaintiff obtained a verdict against the defendants for the sum of twenty-five hundred dollars, damages for injury to his body and limbs, caused by the falling of the central tower of the cathedral of St. Louis, in New Orleans, on the 19th of January, 1850. On this verdict, judgment was rendered. An application for a new trial, was refused by the judge. We infer, from his reasons given for refusing the new trial, that he acted rather with a view to a final determination of the cause by this court, than from any strong convictions of the correctness of the verdict. The defendants have appealed. The amount allowed the plaintiff, has not been contested in this court, the argument being confined to the right of the plaintiff to recover any damages against either of the parties defendant. The amount of the injury received by the plaintiff, and the fact of the accident being assumed, the cause of action is thus stated for the plaintiff :

The plaintiff is a master mason and bricklayer, and was employed by *Kirwan*, who was the contractor, for the rebuilding of the cathedral, as his foreman brick-

layer; he was at work on the tower when it fell, and fell with it. It is alleged in the petition, that the plaintiff was employed by *Kirwan*, under his contract with the Church Wardens, and a clause in the contract is relied upon as fixing the responsibility on the corporation of the church. The clause provides, that the said *Kirwan* binds himself to execute, in a good and workmanlike manner, with the best materials to be provided and paid for by him, under the direction and superintendence of *Mr. J. N. Depouilly*, the architect appointed by the wardens; or, in his default, of any other person appointed, &c., all the works described in said contract. The petition charges, that the fall of the tower was the consequence of capital defects in the plan on which the rebuilding of the edifice was to be effected, and also the unskillfulness, neglect and imprudence of *Kirwan* in his work. The plaintiff was employed by the defendant, at the rate of sixty dollars a month, and when he came to the building, *Kirwan* pointed out to him, *Depouilly*, who was architect of the wardens, and designated him as the person under whose directions he was to act.

The opinions of two witnesses, whose testimony was taken on the trial, concur in assigning for the fall of the tower, three principal causes: 1st, that the work was advanced too rapidly and in bad weather; 2d, that the new work had not been sufficiently anchored or secured with the old work; and, 3d, the removing of the centre from under the arch. The height of the tower when it fell, was seventy-eight feet; the span of the arch was sixteen feet. On the 16th of January, the centre or wooden frame upon which the arch had been turned, was removed by the orders of *Depouilly*, and on the 19th following, in the morning, the tower fell.

I do not think the evidence discloses any negligence or fault on behalf of the plaintiff, which contributed to the accident, and would, if established, defeat his action under the rule recognized in the cases of *Myers* v. *Perry*, 1 Ann. 372. *Carlisle* v. *Holten*, 3 Ann. 48, and *Murphy* v. *Diamond*, ib. 441.

The wood frame was removed from the arch fifty-one days after the arch was completed; and the removal was made by *Camp*, the plaintiff, by the positive order of *Depouilly*, who superintended the work, as the architect, according to the requisitions of the contract with *Kirwan*.

I think the evidence establishes clearly, that the removal of the wooden frame from the arch, was the immediate cause of the accident. But we think it equally clear, that the tower would not have fallen, had the arch been properly constructed, as to workmanship and materials, and the superincumbent weight been properly distributed according to the rules of art. The primary cause, we have no means of ascertaining, the evidence on that point being altogether unsatisfactory. We shall proceed to consider the liability of each of the parties defendant, under the state of fact which I think the evidence presents.

By his contract with the Church Wardens, *Kirwan's* work was to be executed in a good and workmanlike manner, with the best materials, under the direction and superintendence of *Depouilly*, the architect appointed by the wardens, or some other architect by them selected, and agreeably to the plans and drawings to be furnished by him, the said *Depouilly*, in accordance with the plans annexed to the contract. Accordingly, *Depouilly* used to visit the building two or three times a day; examined and inspected the work as it progressed; and on the 12th of January, four days before he directed the removal of the frame which supported the arch, he gave *Kirwan* an order for the payment of $2500, being the tenth installment due according to the contract, which order was paid on that day. It appears, that *Depouilly's* superintendence was

CAMP
*v.*
THE WARDENS
OF THE CHURCH
OF ST. LOUIS.

aided by a building committee, appointed by the wardens, according to the contract; and it was upon their written orders, as well as *Depouilly's,* that the several installments were paid.

In this connection, it is proper to remark, that so far as third persons are concerned, the work must be considered as having been delivered as paid for. Code 2732. I find nothing in the law or the facts of the case, which relieves the Church Wardens from the liability imposed by law on the owners of buildings which have fallen down. In regard to that liability, it is not material to scrutinize the evidence as to the original cause of the falling of the tower. Whether the cause was in the plan or in its execution, it fell, and caused the plaintiff damage ; and it results from the evidence, that there was some defect in plan, work, or materials ; no other cause for its falling, having been made out in the evidence or shown in the argument.

The general rule of law is, that a principal is liable to third persons for the torts, neglects and omissions of duty of his agent, in the course of his employment. The rule is founded upon public policy and convenience ; for, were it otherwise, there would be no safety to third persons in dealings with him, through the medium of agents, and no protection against injuries caused by the careless and reckless selection of incompetent or worthless agents. Pothier on Obligations § 121, § 453. Droit civil de Toullier, book 2, tit. 8 § 284, vol. 11.

It is contended, on behalf of the Church Wardens, that the facts in evidence bring this case within an exception to the rule, which is, that the relation of principal and agent, master and servant, creates no contract, and, consequently, no duty, on the part of the principal, that the agent or servant shall suffer no injury from the negligence of others employed by him in the same business or service; and that in such cases the servant and agent takes upon himself the hazards of any such business or employment, and the case of *Hubgh* v. *The Carrollton Railroad,* recently decided, but still under advisement, is referred to as recognizing this exception. The application of the rule was recognized in that case. The principle, or one of the principles upon which that case was decided was, that no party is entitled to reparation for an injury, to which he has contributed by his own fault or neglect; a rule which we have frequently enforced in cases of injury, from causes which are dangerous and affect the public safety. And, in the present case, if from the evidence, I thought the plaintiff was in that category, I should conclude that his action would fail on that ground. He was employed as foreman of the bricklayers, and I do not find that any fault or neglect on his part has been established, although my impressions on the argument of the case were otherwise. An examination of the testimony has satisfied me, that the finding of the jury ought to be undisturbed as to this part of the case. The decisions cited by counsel in support of this exception to the general rule, have gone to the extent contended for, and it may be considered as the established law in England. In the United States cases of its application, in dangerous works, are constantly occurring, There is no necessity in the present case, of determining to what extent these decisions would be recognized as authority, under our jurisprudence. The principal cases are *Priestly* v. *Fowler,* in the Exchequer, 3 Meeson and Welsby, 1. *Hutchinson* v. *York Railway Company,* Law Reporter of February last, vol. 3, No. 10, 587, and cases there reported· *Farewell* v. *Boston and Worcester Railway Company,* 4 Metcalf, 49. *Murray* v. *South Carolina Railway Company,* 1 McMullan, 385. *Winterboltan* v. *Wright,* 10 Meeson and Welsby, 109. *Strange* v. *McCormick,* Law Reporter for April 1851, decided in the district court of Alleghany county, Pennsylvania. *Daniels* v. *Mann,* 10 Meeson and Welsby, 546.

The Court of Cassation, in 1841, recognizes no such exception to the general rule, of the responsibility for the acts of servants in the business of their employment, and held, that no such exception existed under the Code Napoleon. *Reygasse* v. *Plazen*, Dalloz R. 1841, 1st part, 271.

The case is one of the falling of the wall of an unfinished edifice, in the centre of a populous city, and on the line of one of the principal streets. The protection of the public against accidents of this kind, has been specially provided for by the former and present laws of Louisiana.

The Roman law, which guarded with so much care, the safety of the citizen and the protection of his property and person, gave the right to the neighbor of a building, which threatened to fall, to demand security from the owner or possessor against the impending damage, *cautio damni infecti*. If the security was not furnished, the prætor was authorized to put the complainant in possession of the building. Law 40, *ff. de damno infecto*, 39, 2. The laws of Spain and of France have ample provisions on this subject. Partida 3, tit. 32, laws 10,11. Domat lib, 2, tit. 8, § 3. Toullier vol. 11, 317. Our code gives the neighbor a right of action against the proprietor, to compel him to demolish or prop up a building which threatens to fall. Art. 667.

The art. 666 provides, that every one is bound to keep his buildings in repair, so that they neither fall, nor any part of the materials, composing them, may injure the neighbors or passengers, under the penalty of all losses which may result from the neglect of the proprietor in that respect.

The owner of the building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair, or when it is the result of a vice in its original construction. Art. 2302. The damage caused, is not always estimated at the exact value of the thing destroyed or injured ; it may be reduced according to circumstances, if the owner of the thing has exposed it imprudently.

That these provisions are entirely independent of the general rules concerning the responsibilities of master and employers, and not in any manner connected with their relations, is shown conclusively by their place in the code. These articles are in the same chapter, and follow immediately that which provides for the latter, which is numbered 2299. They are evidently founded in an enlightened view of public necessity. They protect the neighbor ; the passenger in the street ; and it would be singular. indeed, if the men at work at the building were excluded from their just and salutary operation.

It seems to me obviously to follow, that the undertaker, who puts up to the danger of the public a building defective in plan, materials, or work, is equally liable, in principle, with the owner, for damage occasioned by its falling down. Indeed, a stronger moral responsibility exists on his part. The owner is rendered liable from the policy of the law alone. He rarely knows any thing about the security of the work, either resulting from the plan or its execution. On the other hand, in the eye of conscience, the undertaker is the responsible man.

I do not find any legal reason, which can exempt *Kirwan* from his responsibility with his co-defendants. It is said, that the frame was removed by the order of *Depouilly*, during the absence of *Kirwan* from the building. This fact is not proved, and if it had been, would not have altered the case. The fall of the tower did not take place until the third day after the removal of the frame, and from the testimony, and from the duties of *Kirwan*, the jury were

CAMP
*v.*
THE WARDENS
OF THE CHURCH
OF ST. LOUIS.

authorized in acting on the knowledge and approval of *Kirwan*, of the ramoval directed by *Depouilly*, which was clearly within his powers of direction end superintendence conferred on him by the contract.

The undertaker is responsible for the deeds of the persons employed by him. Code 2739.

The judges of the court being equally divided in opinion in this case, the judgment of the district court is therefore affirmed, with costs.

SLIDELL, J. I consider the verdict of the jury as finding these facts: 1st That there was no negligence or fault on the part of *Camp*, contributing to the disaster by which he suffered. 2d. That there was fault on the part of *Kirwan*, which did contribute to it. 3d. That there was also fault on the part of the corporation, through its building committee, (composed of its own directors,) and its selected superintendent, which contributed to the disaster.

I think the evidence in the cause authorized this finding.

It does not seem to me to be the duty of a jury or court, to measure the comparative degrees of negligence and fault, on the part of the respective defendants, so far, at least, as the plaintiff is concerned.

I think that in an ordinary case, where a landholder makes a contract with an undertaker, (as he is termed in our code) to erect buildings on his land, and in the performance of the work, by the undertaker, an accident occurs to an individual, whether a passer by, or a person laboring at the work, the landholder, who has not resumed possession, and who has used reasonable diligence to select a discreet and competent undertaker, is not answerable to the person injured. It seems to me, that whatever responsibility there may be for such accident, is thrown upon the undertaker, by the article 2739 of our Civil Code. But the Church Wardens took their case out of the ordinary category, by retaining a continuous and active direction and control over the construction of the work. By reason of the exercise of this discretion and control, they, in my opinion, are answerable to *Camp* for the consequences of the defectiveness of the work, and especially for the premature removal of the frame work, in the absence of *Kirwan*, and without, at all events, his contemporaneous concurrence.

I concur with the chief justice, in the conclusion, that the judgment should be affirmed.

ROST, J. The plaintiff was employed by *J. P. Kirwan*, as master mason, in the reconstruction of the Church of St. Louis, which the said *Kirwan* had undertaken, under a contract, with co-defendants.

When the tower of the church had been raised to the height of seventy-eight feet, it fell suddenly. The plaintiff was at work upon it at the time, and fell with it. The injuries he received by the fall, are of a serious and permanent character.

This action is brought under art. 2299 of the code, which provides, that masters and employers are answerable for the damages occasioned by their servants and overseers, in the exercise of the functions in which they are employed; and also, under art. 2302, which makes the owner of a building answerable for the damages caused by its fall, when that fall is the result of a defect in its original construction.

The defendants pleaded the general issue; and the church wardens further averred, that the building was in possession of *Kirwan*, under a contract, at the time of the accident, and that they were not responsible for it.

There was judgment against both defendants, *in solido*, for $2500, and they have appealed.

Before going into an examination of this case, it is necessary to premise that, so far as the two articles of the code relied on, apply to this case, the responsibility which they create against the master and house-owner, is of the same nature and degree. As a general rule, under these articles, the master and house-owner are alike responsible for slight neglect.

The policy of those provisions of law is not denied, and if the plaintiff was a stranger to the defendants, his right to recover would be undoubted. But, the facts being found in his favor, by the verdict of the jury, this case again presents the question so much discussed in the case of *Hubgh* v. *The New Orleans and Carrollton Railroad Company*, whether the rights of servants, against their master or employer, in such cases, are the same as those of strangers.

It is a singular fact, and one which, in my opinion, is not without weight against the pretensions of the plaintiff, that although the institution of master and servant is the most ancient of social institutions, and cases, such as this, must have occurred in every country from the beginning of time, they have not, until within a few years, formed the subject of judicial adjudication. This clearly shows, that whatever the law may be, the common sense of mankind is against the maintenance of such actions. Of late, however, many such actions have been brought in England and the United States, and we have been favored with one decision of the Court of Cassation on the same point. *Hutchinson* v. *The York, Newcastle and Berwick Railway Company*, 14 Jur. part 1, p. 837. *Wigmore* v. *Jay*, 14 Jur. part 1, pp. 837, 838, 841. *Priestly* v. *Fowler*, 3 M and W, p. 1.

The decision in France is directly adverse to those made in England and the United States. It places servants, in all cases, on the same footing as strangers, while the English and American courts hold, as we did in the case of *Hubgh*, that the master is not responsible when the servant, by whose fault the injury occurred, was a person of ordinary skill and care. Those countries being governed by different systems of jurisprudence, it might, at first sight, be supposed that the conflict in the decisions of their courts, arose from different legislation. But their disagreement is not to be explained in that way. The decisions made on both sides, show that the law, so far as it protects strangers, is the same under the two systems, and it will be conceded that in both, the contract of hire, of labor and services, is considered as arising from natural law, and subject to precisely the same rules. Story on Bailments, par. 454.

The civil and the common law being the same, there must be error on one side in the interpretation of it. In France, we find but one case which does not appear to have been fully argued. In England and in this country, the question has been viewed in all its bearings, and thoroughly examined in a series of uniform adjudications. Under those decisions, the exemption, from responsibility in the master, has not been limited to cases where the employment of the servant was of a dangerous kind. The greater or less danger, attending the particular employment could not be converted into a rule of law, and if it could, the present case would not come under it, as there are few employments more dangerous or more trying to the nerves, than the building of a high tower.

The English and American cases have been put upon the broad ground, that the servant undertakes, as between himself and his master, to run all the ordinary risks of the service, and that this includes the risk of accidental negligence, on the part of a fellow servant, while in the discharge of his duty.

It would be a great error to suppose this to be an arbitrary rule. It is deducible from elementary principles of law. There is no contract between the

owner of the house and the neighbor or passenger, which can at all modify the fundamental rule, that every man is bound to use his own property, so as to cause no injury to others; and he is accordingly held responsible to them for slight neglect, in the use or care of it. The case is different, however with regard to servants and overseers. As to them, there is, either in fact or in legal intendment, a contract under which the owner receives labor or services, and the servant their value. They are both under obligation, no doubt, to execute the contract in good faith. But it is a contract of mutual benefit, in which ordinary diligence only is required from either. Pothier, Traité du dépôt, No. 23. Story on Bailments, par. 429.

The plaintiff having been employed as master mason, by the contractor *Kirwan*, stands towards the other defendants as if he had been employed by themselves. They were bound only to use ordinary diligence in the selection of their architect and their builder, and as the men selected had been long engaged in these pursuits, and had the reputation of being persons every way competent to the task, I am of opinion, that due diligence was used, and that this action cannot be maintained against them.

If it should be true, in fact, that the architect and builder were unskillful or habitually negligent, the plaintiff, who was working with them, and under them, had a much better opportunity of discovering their deficiencies, than the religious corporation whom he sues. After agreeing to do the work of one of them, according to the directions of the other, he could hardly be permitted to allege their habitual negligence or total want of skill. The injury which he has suffered would, in that case, have been the result of his own imprudence.

I believe that the architect and builder were such, as a prudent father of a family would have been justified in employing. This is sufficient to exempt the corporation from liability.

The claim against *Kirwan*, is equally unfounded; no want of ordinary skill or prudence on his part has been shown. The plaintiff agreed to work exclusively by the directions of *Depouilly*. He was working under those directions when the work fell, and he sustained the injury for which he claims reparation. If the plan which *Depouilly* gave, or the manner in which he caused the work to be done, were defective, *Kirwan* did not assume towards the plaintiff the risks arising from those defects. He is protected against them by the directions he gave the plaintiff, and by the fact, that *Depouilly* was reputed a skillful architect. If, on the other hand, the manner of doing the work under the direction of *Depouilly* was defective, the plaintiff so far from having an action against the defendants, is responsible to them for the loss they have sustained.

The distinction established by the English courts, between the responsibility of the master to servants and to strangers, is clearly established by article 666 C. C., which being in *pari materiâ*, cannot be considered otherwise than as limiting the application of article 2302, to neighbors and strangers, and leaving the responsibility of the master to his servant, to the operation of the contract between them and the laws applicable to that contract. It is in consequence of overlooking this express limitation, that the Court of Cassation, in the case cited, held the master answerable to his servant, for slight neglect, in violation of elementary principles.

I adhere, therefore, to the principle deduced alike from the decisions of the English and American courts, and from the rules to which the contract of letting and hiring labor and services, is subject under our law, that a master is not

responsible to his servant for an injury sustained by such servant in consequence of the negligence of a fellow servant, provided the servant injured was at the time acting in his master's service, and the servant causing the injury was a person of ordinary skill and care.

CAMP
*v.*
THE WARDENS
OF THE CHURCH
OF ST. LOUIS.

PRESTON, J. I concur in the opinion delivered by MR. JUSTICE ROST in this case.

*Benjamin* and *Micou*, for a re-hearing. The questions of law presented by the case are the following:

1. Is an owner of property liable for an accident happening to a third person, by the fall of a building, which is in the hands of a contractor, by the job or plot, before the delivery of the building to the owner?

2. If responsible to third persons, is there or not an exception to this responsibility with regard to the workmen employed on the building.

I. On the first question it is to be observed that, according to all the authorities, the responsibility of one person for the *quasi délits* of another is exceptional; that it is to be confined strictly to the special cases enumerated in the law, and is not to be extended by construction. This view of the subject is supported by the plainest dictates of justice, for in the absence of a contract, it is only in case of fault that one man can be morally bound to pay money to another.

The general principle is laid down in the clearest terms in our code, in the art. 2294: "Every act whatever of man that causes damage to another, obliges him by whose fault it happened, to repair it."

Then comes the exception to the rule, which confines the responsibility to the author of the injury done.

Art. 2296. "We are responsible not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." Plain, definite, and not to be misunderstood. "Persons for whom we are answerable," and things which we have in our custody." Was our contractor a "person for whom we were responsible?" Was the cathedral "a thing in our custody?" The art. 2296, however, contains this additional clause, in speaking of the responsibility of one man for the acts of another: "This, however, is to be understood with the following modifications." Here follows a series of articles describing the modifications: 2297 contains those resulting from the duties of father and mother, tutors and curators of minors; 2298, those of curators of the insane; 2299, those of masters and employers; 2300, those of owners of slaves; 2301, those of owners of animals; 2302, those of owners of buildings.

Now, it is perfectly apparent from this collocation of these seven consecutive articles, that the last six are, in the language of the lawgiver, "the modifications" of the first; that they form one whole to be taken together, and that in determining the meaning of the six separate species enumerated, we must look to the genus which comprises them all. It is, therefore, a sound conclusion that these several responsibilities result, because, as is stated in art. 2296, they arise in cases where the parties charged are either "answerable for others," or are "in custody of the thing." 2297–8 and 9, are cases of "persons answerable for others," 2300–1 and 2, are cases "of persons having custody of things."

Now, the article 2302, under which it is said we are liable, provides, "that the owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction." But the ground of this responsibility is found in the previous general art. 2296. It is because the owner "is in custody" of the building. If, however, he is not, if the custody has not yet been given up to him, if the building, as in the present case, was at the risk of the contractor, as provided in art. 2729, then the reason for the responsibility does not exist, and the maxim applies *cessante ratione, cessat etiam lex.*

It was on this view of the law that we based our plea denying the legal responsibility, under the averment that we had delivered up possession to the contractor, and that the building "was not in our possession nor under our control;" and, indeed, the opinion of his honor the chief justice appears to admit, that this construction of the law is sound, and that, until delivery to us, the responsibility on our part could not arise. The opinion contains this passage:

CAMP
*v.*
THE WARDENS
OF THE CHURCH
OF ST. LOUIS.

"In this connection it is proper to remark, that so far as third persons are concerned, the work must be considered as having been delivered as paid for. Code 2732."

We believe this to be the first time such a construction has been given to this art. of the code, and feel satisfied, that a more rigorous examination will convince the court, that neither the letter nor the spirit of the art. will admit of this interpretation. The stipulation of the contract, as to payments, is, that the contractor is to receive for the whole $77,000, "payable in manner following, to wit: thirty thousand dollars during the progression of the work, at the rate of twenty-five hundred dollars per month, on the certificate of the architect, stating that the work done warrants the said payment; and the balance of $47,000 at two, three, four, five, six, seven and eight years, from the date of delivery and acceptance of the work, in bonds, &c."

Now, let us compare with this stipulation the language of art. 2732: "If work be composed of detached pieces, or made at the rate of so much a measure, it may be delivered separately, and that delivery shall be presumed to have taken place, if the proprietor has paid to the undertaker the price due for the parts of the work which have already been completed."

Surely no argument is necessary to prove, that the cathedral is not a work composed of detached pieces, and as little is required to establish that, when a gross price is agreed to be paid for an entire work, this work is not "made at the rate of so much a measure." Our contract is clearly that which is defined by law as one *per aversionem*.

The language of the court is, that this delivery has taken place "so far as third persons are concerned." As the law makes no distinction of the kind here suggested, and as there is nothing, in the evidence, to give rise to any idea that third persons have been deceived by any apparent delivery, we submit, that it is unnecessary to examine whether cases might not possibly arise, authorizing a distinction between a delivery *quoad* the parties, and one *quoad* third persons, and that it suffices to say that, there is nothing peculiar in the mode of payment or the manner of making it, as provided by the present contract. The payment of part of the price, as a building progresses, and the balance on delivery, is not only the common but the universal usage of the country, and we doubt if a single contract for building can be found in the State, which does not contain a stipulation similar to that inserted in our agreement.

The French Code, art. 1791, is the same as the art. 2732 of our Code. When the French Code was submitted for discussion, the Court Royal of Toulouse gave it the same construction, as is given in the opinion of the chief justice in this case, and therefore objected to the article as being unjust towards the owner. Troplong explains the error of that court. If its construction of the article had been correct, the article would have been rejected; but it was retained in the French Code, because that construction was erroneous. Troplong says : " La cour de Toulouse ne faisait pas attention à un point important dans l'article 1791. ·C'est qu'il n'est pas du tout dans sa pensée de considérer comme une présomption de vérification, des à comptes donnés avant le commencement des travaux, ou même des à comptes payés dans le courant du travail, mais sans imputation sur telle ou telle partie ; l'article 1791 a pris soin d'expliquer sa portée par ces mots trés significatifs : si le maître payé l'ouvrier en proportion de l'ouvrage fait, ce qui veut dire que le payment n'élève une fin de non-recevoir contre les plaintes du maître, qu'autant que l'à-compte a été donné avec la volonté de l'affecter à telle ou telle portion de l'ouvrage déja terminé. Autant il est raisonable entendu en ce sens, autant il serait absurde, si on lui donnait la signification que la cour de Toulouse apercevait en lui. Troplong, Echange et Louage, vol. 3, No. 990."

It may not be improper in this connection to remark, that the whole chapter, which Troplong devotes to this interesting subject, from No. 959 to 1030, show the French law to be in entire harmony with that of England and the United States, and we respectfully refer to it to establish also the additional principle, that where the work falls to ruin during its progress, the presumption of law is, that it is the fault of the builder, and that the whole burthen of proof is thrown on him with such severity, that it is not sufficient for him to show that "*force majeure*" caused the damage ; he must also show, that his fault did not contribute to it. See specially the paragraphs Nos. 987-8 and 9, 995, &c.

We have thus far examined the subject only in reference to those dispositions of the law, which render the owner of a thing responsible for the injury

caused by that thing whilst in his custody. Let us now regard it in another aspect, that of the person responsible for damages occasioned by the fault of those "for whom he is answerable." The only article in the code applicable by possibility to the present case, is the 2299th: "Masters and employers are answerable for the damage occasioned by their servants and overseers, (*leurs domestiques; et préposés,*) in the exercise of the functions in which they are employed; teachers and artisans, for the damage caused by their scholars and apprentices, while under their superintendence.

"In the above case, responsibility only attaches when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it."

Let us for the sake of argument grant, that *Depouilly* was our overseer, (*preposé,*) that the fall of the wall occurred by his fault, that it is logical to say, that the cause of the fall was not the defect of the work, but the taking out of the centre, and that the plaintiff was injured by the fault of *Depouilly*; we still assert, with entire conviction of the truth, the position that the wardens are not responsible under the law.

It is a curious and instructive fact, that the authors of our code have reversed the rule of the French law, in taking this aticle fnom the Napoléon Code. The French lawgiver, acting upon the principle, that the responsibility for faults of others was exceptional, limited by art. 1384, the liability of fathers and mothers to the cases where they might have prevented the damage, and have not done so. But it left the responsibility of masters and employers unlimited. Our code reverses this disposition. It limits the responsibility of the master and employer, and leaves that of the parent unlimited. The French law on this point follows the doctrine of Pothier. Treatise on Obligations, No. 121.

Now we aver, that even under the French law, with the unlimited responsibility of the employer, the plaintiff, in this case, would fail in his action.

In the case of *Platel* v. *Pichon and Omaere*, Sirey 42, 2, 49, the Court Royal of Douai, held in the case of a workman employed on a roof, who had caused damage by letting a piece of wood fall on a person in the street, that the art. 1384, which made employers liable for the acts of their overseers or *préposés*, is not applicable to the case of work confided to a person of a known and definite profession or calling, foreign to the knowledge and personal habits of the owner. That it is only applicable to cases where the workman or overseer, is supposed to be placed as a substitute to replace the owner; and the distinction is a clear and reasonable one. If I employ a man to see to the removal of my furniture out of my house; he replaces me as a substitute. I could do this myself, but choose to put another in my place, and I respond for him. But if I employ an architect, who is a professional man, to superintend a building, the case is no longer the same; I am unable to do it myself from want of knowledge of the art of a builder. He is not doing for me as a substitute, what I could do for myself, but he is hiring to me his professional skill, in the same manner as the builder hires his. Such was the opinion of the Court of Cassation, which says, that if the doctrine of the plaintiff were admissible, there is not a case in which a man employing a workman could escape responsibility, and that such a construction is inadmissible, because a law which imposes on one man liability for the act of another, is an exceptional law, to be restrained instead of extended.

II. The second question which we proposed to discuss was this, whether the owner of the property, even admitting his responsibility to third persons, could be liable to one workman or servant for the *quasi-délet* of another workman or servant, employed in a common work or service.

The opinion of the Chief Justice on this point, concedes that the rule for which we contend, "may be considered as the established law in England." It goes on to say, "that in the United States cases of its application in dangerous works are constantly occurring. There is no necessity, in the present case, of determining to what extent these decisions would be recognized as authority under our jurisprudence."

As the rule of the English law is not conceded to exist to its full extent in the United States, we desire first to show that the limitation of that rule to "dangerous works," is without foundation in reason, and derives no countenance from authority. It is introducing a new, unsatisfactory and indefinite element in the solution of these questions already sufficiently embarrassing in their nature. If the rule is admitted in any case, it will be found on an investigation of the prin-

ciples which support it, that the greater or less degree of danger does not at all affect the question. What is a dangerous work? The insuperable difficulty of defining such a limitation of the rule; the impossibility of applying it with certainty, except in extreme cases, would be sufficient reasons for refusing to adopt it in any jurisprudence.

In one of the cases from England cited by us, that of *Priestly* v. *Fowler*, 3 Meeson and Welsby, p. 1, where a servant of a butcher sued him for injury suffered by the breaking down of a van or cart, driven by a fellow servant, in which van the plaintiff was carrying the defendant's goods, by orders of the latter, Lord Abinger, the organ of the court, gave the reasons at length on which the defendant was exonerated. Not one of them is based on any technical doctrine of the English law, but on the nature of the contract between master and servant. He says, in the course of his judgment, that if the plaintiff's action could be maintained, the principle of liability would be carried to an alarming extent. He cites a number of supposed cases, and amongst them says, "that under such a rule, the master would be liable for the negligence of the builder, for a defect in the foundation of the house, whereby it fell and injured both master and servant by the ruins." He continues, "The inconvenience, not to say the absurdity of these consequences, affords a sufficient argument against the application of this principle."

It is a singular example of the diversity of human judgment, to find a rule upheld by a judge in Louisiana as a salutary rule of public policy, and denounced by another, in England, as inconvenient and almost absurd in its consequences. Both judges bring to bear on the question a large experience and profound knowledge of the law: both consider it without reference to authority, and reason on it as *res integra*, and their examination leads them to conclusions diametrically opposite to each other.

It is to be observed, however, that the judgment of the English Court was the unanimous opinion of the Exchequer Bench, and has been approved, commented on, and adopted by every State in the Union where the question has been discussed; not one case is cited to the contrary; and, we repeat, this has been done not with reference to any special legislation or technical rule peculiar to the common law, but on the eternal and all-pervading principles of natural reason and of justice.

In *Farwell* v. *Boston and Worcester Railroad Company*, 4 Metcalf, 55, Chief Justice Shaw delivered the unanimous opinion of the court, and begins by stating, that the question is of new impression, and involves a principle of great importance. The plaintiff was an engineer on a steam car of defendants; one of his fellow servants, in the employ of the company, turned the switch the wrong way, from negligence and carelessness, whereby the plaintiff was thrown off the car and injured. The case is stated by the court to be brought on the ground of *quasi délit;* it is admitted in the case, that the act done by the servant, in the course of his employment, is considered in contemplation of law, so far the act of the master, that the latter shall be answerable *civiliter*. But the court go on to say, on the question now under consideration: "But this pre-supposes that the parties stand to each other in the relation of strangers, between whom there is no privity; and the action in such case is an action sounding in tort. The maxim, *respondeat superior*, is adopted in that case from general considerations of policy and security. But this does not apply to the case of the servant bringing his action against his own employer, to recover damages for an injury arising in the course of that employment, where all such risks and perils as the employer and the servant, respectively, intend to assume and bear, may be regulated by the express or implied contract between them, and which, in contemplation of law, must be presumed to be thus regulated."

We again quote from the decision, because in the opinion given in our case, the Chief Justice says that public policy is just the reverse, but the reasons are not given; whereas the Supreme Court of Massachusetts gives the following in support of its view:

"We are of opinion that these considerations," (i. e. of public policy,) "apply strongly to the case in question. Where several persons are employed in the conduct of one common enterprise or undertaking, and the safety of each depends much on the care and skill with which each other shall perform his appropriate duty, each is an observer of the conduct of others, can give notice of any misconduct, incapacity or neglect of duty, and leave the service if the common employer will not take such precautions and employ such agents as

<div style="float:right">CAMP
*v.*
THE WARDENS
OF THE CHURCH
OF ST. LOUIS.</div>

the safety of the whole party may require. By these means, the safety of each will be much more effectually secured than could be done by a resort to the common employer for indemnity, in case of loss by the negligence of each other."

In New York, the decision of the Supreme Court of Massachusetts is adopted to its fullest extent. *Brown* v. *Maxwell*, 6 Hill, 593. This was an accident, happening to a stone-cutter, by removing a stone from a pile so carelessly that another stone fell and broke the plaintiff's leg. The act was done by command of defendant's foreman, in the absence of defendant.

This was no case of a "dangerous work." In Pennsylvania, the same rule prevails as held in the case of *Strange* v. *McCormick*. Law Reporter for April, 1851. The court reviews the decisions, and places its own opinion on the ground that the action arises *ex contractu*, and not *ex delicto*. In South Carolina the law is the same. *Murray* v. *South Carolina Railway Company*, 1 McMullan, 385.

But the opinion of the Chief Justice in our case, cites the decision in *Reggasse* v. *Plazen*, Dalloz, 1841, 1, 271. This citation is certainly in point, to show that the distinction referred to was not recognized in this particular case. The case was an appeal from the Court Royal of Toulouse. The judgment of that court recognized the exception and discharged the defendant. It was the case of two servants, set to work by the master to trim a hedge, and one was wounded by the negligence of the other whilst they were at work together.

Now, although in this special case of a house-servant (domestique) the Court of Cassation did refuse to recognize the distinction, yet in the case of fellow-workmen it was fully established in the same court. In the case of *Pittet* v. *Montague*, Sirey 1838, 2, 70, the Court Royal of Lyons in deciding against plaintiff, whose claim was based on the negligence and unskillfulness of a fellow-workmen in running certain machinery, say, "l'accident aurait été causé par la faute personelle d'un préposé, vis-à-vis d'un autre préposé pour le même travail, et l'article 1384 n'est pas applicable à ce cas, parcequ'il y a de la part de celui qui consent à fournir, assistance salariée ou officieuse pour un travail quelconque, acceptation des chances de danger qu'il peut présenter, &c.

The Court of Cassation, in confirming this judgment, gave the following reasons:

"Que lorsque des ouvriers sont occupés ensemble au genre de travail qui leur est special, l'imprudence d'un d'eux peut bien ouvrir contre lui une action en responsabilité, mais ne saurait donner lieu à la garantie de l'ouvrier contre le propriétaire pour lequel ils ont travaillé : que les risques que peut présenter leur travail sont compensés vis-à-vis du propriétaire par salaire spécial de leur genre d'occupation."

Hence, we find two Courts Royal and the Court of Cassation combined against one stray decision of the latter court about household servants. But all the decisions in the French courts, recognize the exemption of the owner from liability for the negligence of one mechanic, or his want of skill, when causing damage to a fellow-laborer on the same work.

And the law of Louisiana, article 666, expressly limits the responsibility of the owner to cases of damage to "neighbors and passengers," resulting from the neglect of the proprietor to keep his building in repair.