(54 South. 963.)

No. 18,218.

ENGLERT v. NEW ORLEANS RY. & LIGHT CO. et al.

(March 13, 1911. Rehearing Denied April 24, 1911.)

(Syllabus by the Court.)

1. CARRIERS (§ 306*) — JOINT NEGLIGENCE — LIABILITY.

Where the track of a city railway company is obstructed through the combined fault and negligence of the company and of another corporation, employed by it to do certain work, with the result that a car is derailed and a passenger, riding therein, is injured, the two parties at fault may be held liable, in solido, for damages, in an action ex quasi delicto.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1249–1251; Dec. Dig. § 306;* Railroads, Cent. Dig. §§ 812, 841.]

2. MASTER AND SERVANT (§ 318*) — INJURIES TO THIRD PERSON—INDEPENDENT CONTRACTOR.

Where the employer retains supervision of the work, he cannot escape liability for injury inflicted upon a third person through the negligence of the employé in the doing of such work, under the plea that the employé is an independent contractor.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1257, 1258; Dec. Dig. § 318.*]

3. MASTER AND SERVANT (§ 310*)—INJURIES TO THIRD PERSON — NEGLIGENCE OF EMPLOYÉ—LIABILITY OF EMPLOYÉ.

An employé, committing a tort whereby a third person is injured, cannot escape liability therefor, under the plea that the tort was committed in accordance with the directions of his employer.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1235; Dec. Dig. § 310.*]

(Additional Syllabus by Editorial Staff.)

4. DAMAGES (§ 132*)—EXCESSIVENESS — PERSONAL INJURIES.

A passenger at the time of her injury was 43 years of age, weighing 154 pounds, mother of 11 children, and had always enjoyed good health, being able to do the work for a family of seven. As a result of the injury, her spinal cord was affected, resulting in complete paralysis of her right leg and almost complete paralysis of her right arm, with an affection of the heart, producing painful smothering attacks, requiring frequent attention of a physician. Up to the time of trial her physician had visited her more than 400 times, the bill amounting to $800, and $225 had been paid to the druggist. It appeared that she would in the future require not only some one to wait upon her constantly, but would never be able to dispense with the services of a physician. Held, that a recovery of $10,000 should be increased to $15,000.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 372–385; Dec. Dig. § 132.*]

Appeal from Civil District Court, Parish of Orleans; W. B. Sommerville, Judge.

Action by Mrs. Magdalena Englert against the New Orleans Railway & Light Company and others. There was a judgment for plaintiff against the mentioned defendant, and a judgment of dismissal as to the other defendant, and the mentioned defendant and plaintiff appeal. Modified.

John P. Sullivan and Arthur Landry, for appellant Englert. McCloskey & Benedict and Frank Wm. Hart, for appellant New Orleans Ry. & Light Co. T. M. & J. D. Miller, for appellee Jahncke Navigation Co.

Statement of the Case.

MONROE, J. Plaintiff sues the New Orleans Railway & Light Company and Jancke Navigation Company, in solido, for damages for personal injuries sustained by her through the alleged fault and negligence of the two companies; the facts of the case, as disclosed by the evidence adduced, being as follows: Plaintiff, who was then 43 years

of age, weighed about 154 pounds, had been the mother of 11 children, had always enjoyed good health, and was able to do, and did, the washing, ironing, and housework for a family of seven, having spent the afternoon of June 11, 1908, with her husband at West End, left there between 6 and 6:30 o'clock p. m., upon one of the defendant's electric motor cars, to which several trailers were attached, to return to the city, taking the place next to the window, in the second or third seat from the rear end, on the left, or east, side of the car. The train was stopped to take on passengers near the Frisco bridge, which crosses the canal (alongside of which the track is built); and, at a point which is variously estimated at from 150 to 350 feet, on the city side of the bridge, the forward trucks of the car in which she was seated left the rails and the car plunged downwards to the right, so that when it was stopped the forward end was down the embankment upon which track is laid, pointing, at something less than a right angle, in the direction of the canal, whilst the rear end remained elevated, upon the track. The cause of the derailment was the presence on the track, or upon the rail lying nearer to the canal, of a lot of shells, which had been sold to the railway company by the navigation company, and which, under separate contract, the navigation company had unloaded at that point (from barges which were lying in the canal) for and, in a measure, under the direction of the railway company. The space which had been selected and, to some extent, prepared by the railway company for the deposit of the shells was about 150 feet in length along the bank of the canal, by a width (representing the distance between the waters of the canal and the railway track) of from 15 to 35 feet. The shells were being unloaded by means of a steam dredging apparatus, the operation of which is thus described by one of the witnesses, to wit:

"Well, the dredge boat was tied to the bank, right alongside the unloading place, and the barge was brought alongside of the dredge boat and fastened to the dredge. We had a clam shell dredging bucket, which was lowered into the barge, and the shells were dipped out of the barge and raised into a hopper. The hopper fed onto a stationary belt that carried the shells across the width of the dredge, when they were dropped onto an endless belt—a conveyor, as it is called—and conveyed ashore."

The conveyor was supported by a wire cable attached to a masthead on the dredge, and its movements, as the shells were to be deposited at one place or another, were regulated by a boom, which was also supported by a cable attached to the masthead. The dredging bucket dipped up about 1½ cubic yards of shells at a time, and the hopper was capable of holding 10 or 12 cubic yards. When the landing was clear, the shells were allowed to run off the end of the conveyor, which they appear to have done with considerable velocity, but, after the pile reached a certain height, a board was dropped across the current running from the end of the conveyor, so as to prevent the shells from overshooting the top of the pile, and make them fall straight down.

As the result of the method of unloading thus described, the shells, as the pile rose higher and higher, would assume the form of a cone, or (as the end of the conveyor was moved along) of a ridge, with the base extending, on the one side, to the canal, and on the other, to or over the railroad track, and there is no doubt that, upon the evening of June 11, 1908, it extended over the rail nearest to the canal, and, resisting the passage of the forward wheels upon that side of the car in which plaintiff was riding, produced the effect of pulling the car in that direction and causing the forward end to leave the track; the wheels upon the other side not meeting with the same resistance. The unloading apparatus belonged to the navigation company,

and was operated exclusively by men employed and paid by it; and its contract with the railway company required it to unload the shells at a given price per barge. On the other hand, the railway company selected the landing place and prepared it, to the extent of cutting away the undergrowth and perhaps leveling it, for the reception of the shells, and it retained such control of the matter as would have enabled it to stop the unloading at any particular point within the 150 feet representing the length of the landing, and order its transfer to some other point where there were fewer shells. Beyond that it is fairly deducible from the evidence that the men operating the unloader knew, as a thing that was obvious, and, moreover, understood from the instructions that were given them by the representative of the railway company (whose testimony was not taken, because of his death), that they were not so to unload the shells as to obstruct the railroad track. Birckel, who at the time of the accident was the assistant in charge of the unloader, and who when he testified was the captain, having stated that a few minutes before the accident he had gone downstairs, on the dredge boat to look after the boiler, was asked how he knew that he had to go downstairs, and he answered and further testified as follows:

"A. Because I was up on the conveyor boom; that was part of my work. I was on the end of the conveyor boom, because it was my business to go there and see that the shells didn't go on the track. That is the way we could tell. When we had enough in one place, we would move the boat. While I was up there, I had a board on the end of the boom, to make the shells fall straight down. We worked for a while without the board, and that makes the shells go about eight feet away from the edge of the boom. When we got a pile there, as much as we thought it safe to put there, then we drop the board, and that makes the shells drop straight down in this way (indicating). While I was standing there, this boiler got to foaming, and that caused the water to pass into the engine and the belt slowed down. So I left the end of the boom, and came down on the boom and closed the hopper door, and then went down on the deck to attend to the engine.

Q. And while you were down there, this accident happened, and the car was derailed? A. Yes, sir; somebody called out, then, that there was a car off the track. Q. Now, who was the one that looked to see if it was safe, and where to put the shells; was it you or the captain, who had to do that? A. Well, if the captain was running the digger, then I looked after it; and if I was running the digger he was the one to look after it. Q. Why did you do that? A. Well, we didn't have any order to do that, but we did it. * * * Q. You didn't want the shells to cross the track? A. Well, I wasn't told to keep them off the track; I wasn't told anything. Q. And you didn't care? A. Well, I don't think I would want to go to jail for blocking up the basin with shells, or putting them on the railroad track. I suppose I was getting paid for what I was doing. Q. To get them off the track? A. Well, all the orders I got was from Capt. Newton. Q. Did he tell you to see that the shells didn't get on the track? A. He told me that he wanted me to put the shells along there. Common sense would tell a man that he is not supposed to block up a railroad track."

And there is other testimony to the same effect. The witnesses for the navigation company say that the unloader was not operating at the moment of the accident, but had been shut down a few minutes before because of the foaming of the boiler. The motorman of the car that was derailed and a passenger named Clark, testifying for the railway company, say that when the car traveling at a moderate speed got within five or ten feet of the shells the pile appeared to cave in, and that the shells came upon the track so suddenly that it was impossible to stop the car in time to avoid running into them. Some witnesses testify that they had passed over the track a short while before the accident, and had observed no shells; others that they had passed over it and had observed shells, and had remarked that it was dangerous.

Newton, who was the captain of the dredge when the accident occurred, says that he had frequently spoken to Bronson, who was representing the railway company, about the propriety of putting up a fender to keep the shells from running over the track, but that it had never been done; that he had seen cars roll over shells "until the shells,

between the rails, due to the loading of cars by hand, would get so high that the flanges of the cars (wheels) would be riding on the shells"; and that "on two or three occasions he remembered moving shells off the track, when the railroad company had been loading its cars at that landing."

It is therefore evident that he understood perfectly that the track was not the place where the shells were to be put, whether by him or by the railway company. On the other hand, it is shown, beyond dispute, that no representative of the railway company was about the shell landing on the day of the accident, until some time after that event, and it is not shown or suggested that the railway company loaded any shells upon its cars upon that day.

It was the habit, it may be remarked, of those engaged in unloading the shells from the barges to pile them on the landing to a height of 12 or 14 feet, in such a manner that the piles sloped down to within a foot of the railway track, and that course was pursued, under the directions of the representative of the railway company, in order to facilitate the loading of the shells onto the cars of that company. The testimony as to the speed of the car, as upon some other points, is conflicting. The motorman thinks it was five or six miles an hour; the conductor eight miles; other witnesses say that it was unusually high for the place. in view of the fact that shells, in greater or less quantities, were to be expected on the track, and that the cars usually slowed down at that point. Defendants say that the car could not have acquired any great speed, because it had stopped at the Frisco bridge, and the distance from there to the shell landing was insufficient to have enabled it to do so.

It is not shown, however, whether the distance referred to was 150 or 350 feet, and we find nothing in the record, and know of nothing, to warrant us in holding that the distance, whatever it may have been, was not great enough to have enabled the car to attain a speed of 25 miles an hour or more.

Our conclusion upon this branch of the case, then, is, that, whether, from the manner in which they were piled, the shells slid down upon the track, or, from a failure to drop the plank at the proper time, they were propelled upon the track by the conveyor a moment before the accident, or whether they had, in either of those ways, or in some other way, been put there minutes or hours before, the facts are that they were there when the car in which plaintiff was riding arrived; that they were put there by the navigation company; that they, possibly combined with some negligence on the part of the motorman of the car, caused the accident; and that the circumstances were such that both the railway company and the navigation company should have anticipated and provided against that result.

The consequences of the accident to the plaintiff were, and are, and will be, most deplorable. Plaintiff, as we have stated, weighed 154 pounds, and by reason of the bouncing, derailment, downward plunge, and sudden cessation of the forward movement of the car she was thrown from her place near a window into the aisle, at a point about two seats farther forward than that which she was occupying. She testified that the car ran upon the shells and began bouncing, and that she lurched forward, after which the next thing that she knew she was regaining consciousness in about the fifth seat from the rear end, and upon the other side of the car from where she was seated, with her husband beside her, facing toward the rear. The husband did not testify (being disqualified), but a witness named Roth states that he was occupying a seat near the front of the first trailer, and that he saw a lady and gentleman, who are sufficiently

identified as plaintiff and her husband, in the car in front of him; that the lady "was thrown about two seats higher up; she was thrown bodily, into the aisle of the car," and the gentleman picked himself up and then picked her up and put her in a seat.

Plaintiff testifies that upon regaining consciousness she was suffering such pain in her back that she was unable to move, and it appears that after a little while she was lifted by two men into a wrecking car, in which she was carried to the foot of Canal street, where she was transferred to another car, and thence to another, and still another, until she finally reached the corner of Camp and Felicity streets, and was thence assisted and carried to her home near by, where she was placed in a chair, to await the arrival of the family physician, Dr. Caire, who was sent for immediately. The character and present and probable future effect of the injury which she sustained are established mainly by the testimony of Dr. Caire, and by that of Dr. Archinard, who was called in consultation on several occasions, as having a wide experience in the treatment of diseases of the nervous system. The consensus of their testimony is that, as a result of the accident, plaintiff received injury to her kidneys, superinducing a diseased condition of those organs; that she received an injury to her spinal cord, which has resulted in complete paralysis of her right leg and almost complete paralysis of her right arm; and that there has also developed an affection of the heart, producing painful smothering attacks which require the frequent attendance of a physician.

Dr. Caire testified that he had attended the family for about 10 years, but had no distinct recollection of having been called on to prescribe for plaintiff; that "she seemed to be a woman in perfect health"; that he was called to see her upon the evening of

128 LA.—16

June 11, 1908, and his testimony proceeds in part as follows:

"I found her suffering with an extreme contusion of the back, the lower portion of the spinal column; I also found her suffering with a contusion a little to the right of the spinal column, over the region of the kidneys, and I found her suffering with pain in the lower portion of her abdomen over the pubic bone. * * * Well, I attended her continuously ever since that time. (The testimony was given on January 11, 1910, 19 months after the accident.) About 24 hours after she received the injury, she began to urinate blood, and she urinated blood for about 10 days. After that time the urinating of blood stopped.

"In the course of three or four weeks, or, to be exact about it, in four weeks she developed an albuminuria, and she has been suffering with that practically ever since that time. At times it disappears, under treatment, but returns later. * * * After treating her for some little time, up to about July 18th, I found her condition getting worse, and I * * * found that her condition was getting worse right along. She had not been able to use her lower limbs, and was not able to get out of bed and walk around, and I decided that the spinal column was getting worse. I, therefore, concluded that it was best to call in a specialist, and I did call in Dr. P. E. Archinard. My opinion of the case was that there had been a hemorrhage of the spinal column ('spinal cord' being afterwards substituted by the witness in place of 'spinal column'), and this hemorrhage was causing the trouble with the lower limbs. She later on developed, after three or four months—or, to be exact, in the fourth month after that, she had severe attacks of dyspnœa, smothering, and heart palpitations, and upon making an examination I found that there was a slight mitral regurgitation. * * * I neglected to state that on the third or fourth day I made an examination and found a falling of the uterus—a falling of the womb. Q. Doctor, Mrs. Englert has testified in this case that there occurs a flowing of blood from her womb? A. Yes, sir; since the accident she has had her different periods varying from one to three weeks, and as high as five weeks between the periods, suffering uterine hemorrhages, which were so severe at one time as to resist all treatment. I, therefore, called in Dr. Miller, a specialist in diseases of women, and he said that there was nothing to do, except to treat her as well as we could; that operative measures would do no good, and that it was attributable to her general condition. * * *

"The lower limbs and hands and face at times became very much swollen. * * * Q. Now, Doctor, the pain in the stomach, and the swelling that she complains of, what about that? A. I think that is partly due to the enlarged uterus, as well as the enlarged kidney. The kidney is decidedly enlarged ever since she received the injury. There has been

an inflammatory condition coming on there right along. Q. What about the condition of Mrs. Englert's right arm? A. Her right arm? Q. Yes. A. She has only partial use of her right arm. * * * In the first few months she had no use of it at all. It is only lately that she had a little use of it, and it is very little use. * * * As far as her right leg is concerned, she has practically no use of it at all. She cannot stand on it; * * * the left leg is partly affected, but it is not as bad as the other. * * * Q. These hemorrhages that you describe, occurring in the spinal cord, by what are they caused? A. Well, the cause is evidently due to the force of the blow that she received on the back, rupturing one of the blood vessels. * * * Q. Has she been able to leave her bed or move around from the time of the accident up until the present date? A. She has not been able to move about; no, sir; but she has been out of bed in an invalid chair. * * * Q. She can't get in it by herself? A. No, sir. Q. Can she walk at all? A. No, sir; she cannot walk at all. * * * Q. Now, Doctor, do you hold out any hope of recovery for Mrs. Englert, as to her health? No, sir; I do not. Q. You think that her present condition, her suffering and ailment, will cause her death? A. I think it will finally wind up that way; yes, sir. Q. Will Mrs. Englert, at any time, be able to dispense with the service of a physician? A. No, sir, I don't think so. * * * Q. Has she ever been out of pain, as a matter of fact, from the date that the accident happened until the present time? A. No, sir; at no time, except when she was under the influence of opiates."

Dr. Archinard testifies in part as follows:

"When I was called in to see Mrs. Englert, she was suffering with a hemorrhage inside of the spinal column—the spinal cord. * * * Now the kidneys have their blood supply from the same part of the cord where the right leg had been paralized, and it was easy to see that the kidneys had been injured. * * * I saw her only at times when Dr. Caire thought that I ought to see her, to see whether there was an improvement; and there never was any improvement. I saw her afterwards, when she had developed a considerable amount of kidney disease. * * * I believed then, and I believe now, that the kidney disease was due to an injury of the kidney."

The paralysis of the right leg, he says, was at that time almost complete. Being asked what hope there was of Mrs. Englert's recovery, he replied:

"Well, I never saw a serious affection of the spine get well. I have a ward full of such cases at the hospital. Sometimes they get decidedly better, but they never get well. Destruction of the spine is a destruction forever."

The doctor testified that he had examined Mrs. Englert about a month before, or, say, in December, 1909, and, being asked whether he found any improvement in her condition, he replied:

"No, sir, I did not; in fact, she was worse than she was about six months before that, when I had seen her. * * * Q. But she might improve, might she not? A. We have no proof of that, and I don't think so. That is based on my former experience in other cases. * * * Q. But you don't predict any fatal results? A. I don't predict anything at all, except that she is going to be crippled now; and she has some kidney disease which is dangerous. I have known people with bad kidneys to live for 20 years, and I have known them to go off in a hurry."

Plaintiff was examined by two physicians representing the railway company, and, as they were not called upon to testify in the case, we infer that their conclusions did not differ from those of the physicians who were examined on behalf of plaintiff. There was judgment in the court a qua in favor of plaintiff, and against the railway company, in the sum of $10,000, the demand against Jancke Navigation Company having been dismissed, as in case of nonsuit, and the railway company and the plaintiff have appealed; the latter asking that the amount of the award be increased to $26,075, and that Jancke Navigation Company be condemned, in solido, with the railway company.

### Opinion.

[1] Plaintiff, no doubt, had a right of action against the railway company for the breach of its contract for her safe carriage, but equally beyond doubt, she had a right of action ex delicto against the railway company, as she had against the navigation company, for the damages resulting to her from their negligent obstruction of the public highway over which she was traveling, and it is the right last mentioned that she is here asserting.

[2] The negligence of the railway com-

pany, as we conceive, consisted in its causing the shells purchased by it to be piled in such a manner and in such proximity to its track as to render it not only possible, but highly probable, that they would be thrown or fall upon and obstruct the track, and thereby derail its cars, and the fact that it selected and prepared the place where the shells were to be put, and directed that the toe of the pile should come as near as possible to the track, without taking the precautions necessary to prevent their getting on the track, cuts off its escape from liability, under the plea here set up that the navigation company was an independent contractor, for whose acts and omissions it is not responsible. [3] The navigation company on the other hand, cannot escape the liability here sought to be enforced on the plea that the railway company employed it to put the shells where it did, because, in the first place, employer and employé are alike responsible to a third person for injuries resulting from the tort committed by the employé while acting within the scope of his employment, and because, in the second place, though the railway company was at fault in not providing a proper and safe place for the deposit of its shells, the navigation company was even more at fault in not confining the shells unloaded by it to the place provided, and in actually putting them on a track, or putting them in such a position as that they were likely to obstruct a track, over which cars, freighted with human lives, and running at high speed, were passing every few minutes. That those who participate in the commission of a quasi offense may be joined as defendants in the same suit, and condemned in solido for the damages resulting therefrom to another, has long been settled in this jurisdiction. Loussade v. Hartman et al., 16 La. 120; Camp v. Wardens, 7 La. Ann. 321; Cline, Tutrix, v. Railroad Co. & City, 41 La. Ann. 1031, 6 South. 851. [4] Upon the question of the quantum of damages, the evidence shows that plaintiff's attending physician had, up to the date of the trial, visited her more than 400 times, and that his bill amounted to $800, of which there has been paid $300; that $50 has been paid to the physician who was called in consultation; and that $225 has been paid to the druggist. Deducting those amounts, there would be $8,025 inuring to the plaintiff from the amount awarded in the way of compensation for being in a moment stricken from the position of mainstay of a husband and family to the condition of a helpless, hopeless, suffering invalid, who can neither do for herself nor for others, and to whom the future presents no other prospect than that of dependence and suffering, until death shall come to her relief.

According to the evidence, she will hereafter require, not only some one to wait upon her constantly, but she will never be able to dispense with the service of a physician, which element considered, as also the mental anguish and physical pain which she has endured, and is to endure, we are of opinion that, though there can be no such thing as adequate compensation, the amount awarded by the district court should be increased.

It is therefore, ordered, adjudged, and decreed that the judgment appealed from be amended by increasing the amount of the award to $15,000, and by condemning the Jancké Navigation Company, in solido with the New Orleans Railway & Light Company, for that amount, with legal interest thereon from the date of said judgment of the district court, and all costs.