236 So.2d 556 (1970)
Mrs. Mary Alice ADAMSON, Widow of Eric Adamson
v.
WESTINGHOUSE ELECTRIC CORPORATION, Liberty Mutual Insurance Company, et al.
No. 3675.
Court of Appeal of Louisiana, Fourth Circuit.
June 1, 1970.
Rehearing Denied July 6, 1970.
*557 Dodd, Hirsch, Barker, Meunier, Boudreaux & Lamy, Harold J. Lamy, New Orleans, for plaintiff.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Donald O. Collins, New Orleans, for The Travelers Insurance Co. and the City of New Orleans.
Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, Allen R. Fontenot, New Orleans, for The Travelers Indemnity Co.
Cronvich & Wambsgams, A. W. Wambsgans, Metairie, for Gulf States Elevator Corp.
Christovich & Kearney, A. R. Christovich, Sr., New Orleans, for Westinghouse Electric Corp. and Liberty Mutual Insurance Co.
Before REDMANN, LE SUEUR and SWIFT, JJ.
REDMANN, Judge.
For injuries sustained from the closing doors of a New Orleans City Hall elevator, plaintiff sued the City and its insurer, the elevator manufacturer and its insurer, and the elevator maintenance contractor and its insurer.
From a judgment against only the City and its insurer, plaintiff appeals, seeking both an increase in quantum and judgment against the other defendants.
The City and its insurer also appeal, seeking reversal, or judgment over against the other defendants for indemnity or contribution, or at least reduction in quantum.
Plaintiff's injury occurred, according to testimony accepted by the trial court, as she was going out of the elevator without unusual delay. The doors closed on her, without retracting as they should automatically have done when the rubber safety *558 edges of the door struck her (or even when her body interrupted the light beam to a photoelectric control).
The circumstances of this accident are similar to those of Brechtel v. Gulf States Elevator Corp., 195 So.2d 403 (La.App. 1967), where we refused to apply res ipsa loquitur in a city employee's suit against the elevator maintenance company because the City Hall elevator machinery "penthouse" was accessible to many persons in addition to the maintenance contractor's personnel.
The testimony here, too, is that the penthouse was often unlocked and was at times visited by persons other than the maintenance contractor's men. We agree with the trial court's refusal to supply a res ipsa loquitur inference of negligence against the maintenance contractor, because it did not have exclusive control of the elevators. Nor is there otherwise any showing of negligence on that contractor's part. The judgment dismissing the principal demand as to it and its insurer is correct.
Likewise correct is the dismissal of the City's third-party demand against the contractor and its insurer, since the contract with the City specifies
"The Contractor shall not be liable for injuries or damages to persons or property except those directly due to his or his employees' acts, or omissions, and the responsibility of the Owner for injuries or damage to persons or property while on or about the elevators referred to, is in no way affected by this contract. * * *"
Similarly, for lack of permissible inference or other evidence of negligence, the trial court was correct in dismissing the principal and the third-party demands against the elevator manufacturer and its insurer. This accident occurred because of some malfunction in an elevator manufactured ten years earlier. No defect in manufacture or installation was shown.
The difficulty in the case is that, like in the Brechtel case, the cause of the malfunction of the doors has not been shown. Plaintiff reported her injury to City Hall personnel immediately, but the elevator maintenance contractor gave evidence it was not called to service the elevator at that time.
Indeed there is expert opinion evidence that there could not have been a failure of either the rubber safety edges or the electric eye, since interruption of either electrical circuit would have kept the doors open and would have been demonstrable thereafter. But the electric eye could be turned off, leaving the rubber edges as the only operative safety device, and the trial court was of the opinion the electric eye was turned off at the time of plaintiff's accident.
In any case, according to plaintiff and her daughter the doors did within a very few seconds close upon plaintiff without immediately reopening, supporting the trial court's conclusion of a premature lockout of the door-opening safety devices by the "nudging" feature of the elevator. That feature is designed to prevent undue delay of the elevator, as part of a traffic control system; after a total lapse of, ordinarily, some 25 seconds, the doors will no longer reopen but maintain a steady closing force of 25 to 30 pounds.
In this case, after only a very few seconds, plaintiff was caught between the prematurely unyielding doors and suffered injury in her struggle to free herself.
The trial court held the City liable on a res ipsa loquitur inference of negligence. We are inclined to pretermit res ipsa theory and to find liability rather under LSA-C.C. art. 2322:
"The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair *559 it, or when it is the result of a vice in its original construction."
Our jurisprudence views an owner's liability under art. 2322 as a liability without fault; in effect, "neglect to repair" means failure to keep in repair; Murphy v. Fidelity and Cas. Co., 138 So.2d 132 (La.App.1962) (after remand, 165 So. 2d 497, La.App. 1964, cert. denied). The latest discussion of this liability by our Supreme Court is in Cothern v. LaRocca, 255 La. 673, 232 So.2d 473 (1970).
Indeed it is stated in a Comment, 44 Tulane L.Rev. 119, 152 (1969), that in art. 2322 "The word `neglect', which in English suggests negligence, was translated from French words meaning `failure to maintain," * * *."
"Ruin" is also interpreted broadly; it includes defects in parts or appurtenances of a building, as defective electric wiring, Murphy, supra; or an unguarded window fan, Fontenot v. Sarver, 183 So.2d 75 (La.App.1966); or even a protruding nail, Lasyone v. Zenoria Lbr. Co., 163 La. 185, 111 So. 670 (1927). We believe it includes a defective or malfunctioning elevator.
We conclude the City is liable under art. 2322, and its liability insurer is therefore also liable to plaintiff, LSA-R.S. 22:655.
On quantum, both plaintiff and the cast defendants appeal.
Plaintiff was a 67 year-old woman. She was trapped in her struggle with the doors for some time before an unknown passenger in the elevator managed to force the doors open to free her. Plaintiff testified she was in a panicky state, screaming and crying during the perhaps over-estimated five minutes of her struggle. The trial judge observed that "a woman her age, build and temperament" could not have released herself alone.
Four medical witnesses testified on behalf of plaintiff.
Dr. Labourdette, an internist and plaintiff's family doctor, saw plaintiff on the day of the accident. He found primarily a tenderness to palpation in the shoulders and hips, and prescribed muscle relaxant and pain reliever. Dr. Labourdette also had x-rays taken by Drs. Brierre and Hunt three weeks after the accident, and obtained a report from them. Dr. Labourdette saw plaintiff on seven occasions. On her last visit she still complained of pain about the left hip and left shoulder areas. She was unable to sweep or carry heavy loads, had difficulty doing housework, and appeared depressed. Dr. Labourdette felt that plaintiff and suffered some soft tissue injury about the hip and shoulder. While plaintiff had been nervous, tense and depressed even before the accident, the doctor said it was not to the same extent. He thought she would likely have no permanent residual effects. Most of his findings were based upon plaintiff's subjective complaints.
Dr. Haslam, an orthopedic surgeon, also treated plaintiff. He first saw her some five or six months after the accident, at which time plaintiff still complained of pain in the hip and shoulder areas. Dr. Haslam examined plaintiff and found a slight, visible, palpable atrophy of the left posterior deltoid muscle. He stated that this was an objective sign not uncommonly seen in patients with pain and limitation of motion in the shoulders. Dr. Maslam examined the previous x-rays taken of plaintiff's shoulders and hips and also had additional x-rays taken. X-rays of the pelvis, with special attention to the iliac crest in both hips, showed changes of the greater trochanter on the left side which are sometimes suggestive of traumatic bursitis. Dr. Haslam did not think the x-rays indicated traumatic bursitis here, however, since he considered the changes within normal limits for someone plaintiff's age. He did find a limitation of motion in the left *560 shoulder which was consistent with her complaints and with the accident as related. No definite orthopedic explanation for plaintiff's complaint of pain in the hip area could be found.
Dr. Haslam saw plaintiff five times and also sent her to a physical therapist for treatment and exercise. On her next to last visit, about nine months after the accident, examination of the shoulder showed no atrophy or limitation of motion. Plaintiff said that her shoulder felt better and Dr. Haslam thought that her continued complaints were probably associated with nervousness and depression partially resulting from the death of her husband a short while before the accident.
In October, 1966, plaintiff returned to Dr. Haslam complaining of a recurrence of pain. His physical examination and additional x-rays failed to produce any orthopedic explanation for her continued complaints. Dr. Haslam felt that perhaps plaintiff's age and nervousness were contributing to her persistent complaints.
Dr. Brierre, a radiologist, testified regarding x-rays he took at the request of Drs. Labourdette and Haslam. The first x-rays, taken within a few weeks of the accident, showed no evidence of any injury and were generally negative. But there were minor arthritic spur formations, said Dr. Brierre, suggestive of trochanteric bursitis. Subsequent x-rays revealed approximately the same findings. Dr. Brierre was of the opinion that the changes seen in both x-rays were present at least a year before the accident.
The only other medical witness to testify was Dr. Harry Phillibert, recognized as a general practitioner, who first saw plaintiff on March 30, 1967, nearly a year and a half after the accident. Dr. Phillibert testified at great length concerning his physical examinations and findings, as well as his diagnosis and prognosis of plaintiff's injuries. As will be discussed below, the trial court obviously gave no consideration to this doctor's testimony and we find it unnecessary to detail that testimony here.
In addressing the question of damages, the trial judge commented:
"Mrs. Adamson's injuries were painful but not serious. Her recovery was slow because her age not only militates against any rapid recovery but in part explains her complaints even to the date of trial."
We are unable to disagree with this assessment of plaintiff's injuries, or to find an abuse of the "much discretion" which is left to the trial court in awarding damages, LSA-C.C. art. 1934(3); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). We are satisfied the award of $5,000 is not inadequate, and, although without the benefit of observing plaintiff's temperament and demeanor we might have awarded a somewhat smaller amount, we simply cannot say the award is clearly excessive.
Plaintiff also seeks amendment of the judgment to include medical expenses for the services of Dr. Phillibert and an expert fee for him.
Although he first saw plaintiff some eighteen months after the accident, Dr. Phillibert related the presence of swelling and contusions in the right hip area, bursitis in the left elbow, and contusions of the cervical and thoracic spine. These findings were in no way consistent with those of the other medical witnesses who testified. In fact, Dr. Haslam specifically examined the hip area for swelling or bruises on each of the five occasions that plaintiff visited his office and failed to find any evidence of such injuries.
The trial judge apparently believed that there was insufficient evidence to show a causal connection between the findings of Dr. Phillibert and the accident which befell plaintiff on October 4, 1965. We think the record fully supports this *561 conclusion and therefore agree with the denial of medical expenses. And, since Dr. Phillibert's testimony as an expert was in support of a claim which was totally rejected, the defendant was not the party cast on that aspect of the claim and the costs of that aspect cannot be assessed against defendant. Thus the trial court's refusal to cast defendant for an expert witness fee for Dr. Phillibert was also correct.
The judgment appealed from is affirmed.
Affirmed.