JANVIER, Judge.
This litigation results from a tragic occurrence in a very small bathroom in which four young children were in some manner rendered unconscious, three recovering with little or no harmful results but the youngest, a girl of about two years of age, drowning in water in the bathtub.
The suit was brought against C. J. Tedesco, the landlord from whom the premises were rented, and against American Fire and Casualty Company, his insurer.
The charges are that the gas water heater in the bathroom was defective in at least three particulars, with the result that gas escaped into the room or that, because of the defective venting of the heater, the children were overcome by fumes of the burning gas, and the smallest of the children either was overcome in the tub and drowned, or was first overcome and then fell into the tub.
Henry Dunn, the father, and Elsie Dunn, the mother, who are separated, brought this suit for the loss sustained by each in the death of the daughter, and Henry Dunn, the father suing for the use and benefit of each of the three who survived, claimed on behalf of each the damage which each had suffered.
The defendants admitted that there was in existence a liability insurance policy issued by the defendant insurer with a limit of $5,000 for the damage sustained by any one person and a limit of $10,000 to all persons who might be injured in any one occurrence.
The defendants denied that there were any defects in the heater, and averred *341 •that the accident was caused by the fact that the four young children locked themselves in the very small room with the heat•er burning and were overcome by the heat .and humidity and carbon monoxide which resulted from the burning of the heater for too long a time with so many persons in such a small room. Defendants also •charged in the alternative that there was •contributory negligence in the mother who was in charge of the children in permitting the four children to enter the small 'bathroom at the same time with the hot water running and the heater burning and with the window and the door shut.
The Board of Administrators of 'Charity Hospital of Louisiana at New Orleans intervened and prayed that, in the event liability be found in defendants, there be judgment in favor of the said intervener for the cost of the hospital services made necessary by the accident.
There was judgment in favor of the father, Henry .Dunn, for the use and benefit of each of the three surviving children in the sum of $200 each, and there was further judgment dismissing the suit of the father and of the mother. In the judgment no mention was made of the claim of the intervener.
The mother and the father appealed from the judgment in so far as it dismissed their claims, but the father did not appeal on behalf of the three surviving children in an effort to have the amounts awarded to each of them increased.
Counsel for defendants, erroneously believing that the father had appealed on behalf of the three surviving children, filed what is termed an answer to the appeal and prayed that the judgments in favor of those surviving children be reversed and that their claims be dismissed. When it was called to the attention of counsel for defendants that there had been no appeal on behalf of the surviving children and that consequently the answer to the appeal could have no effect, they readily acknowledged that those judgments were final and could not be reversed. Consequently, there remains only the question of whether there is liability in defendants for the death of the youngest child.
In his reasons for judgment the District Judge found that the hot water heater was defective. He said:
“The hot water heater in this case was defective. As a result thereof the minor children, Henry Dunn, Jr., Roy Dunn and Marilyn Dunn, were asphyxiated and are entitled to damages.
“The death of the minor child, Carol Dunn, was caused by drowning. Whether this child became unconscious as a result of inhaling fumes from the defective gas heater before her death by drowning, or drowned before she inhaled a sufficient amount of these fumes to become unconscious, is uncertain. Either conjecture is plausible. This Court cannot decide the case on the basis of possibilities or even probabilities. The burden of proof is on plaintiff to establish with reasonable certainty the cause of death.”
It is the contention of plaintiffs that the heater was defective in at least three particulars. It was of the instantaneous coil type in which a pilot light is, or should be, constantly burning. The large burner, which is under the coils through which the water passes, is automatically turned on when any hot water faucet is opened and, as the gas enters the large burner, it is ignited by the constantly burning pilot light. In modern heaters — this was a 1918 model — there is an automatic cutoff valve on the gas line which shuts off the main gas supply whenever the pilot light is extinguished, so that if the said pilot light is thus accidentally extinguished, gas cannot enter the large burner and will not escape into the room. .Such a safety valve is required by tthe building code and associated regulations of the City of New *342 Orleans and it is shown that there was no such valve on this heater.
The building code regulations also require that in each water heater there be either a built in down draft diverter, or that there be one in the vent pipe above the heater. Such a down draft diverter is intended to have the effect of preventing the extinguishing of the flame of the burner by wind or down draft coming down the vent. Whether this heater was so equipped we shall discuss later.
It is also claimed by plaintiff that there was no cover or wind deflecting cap on the top of the vent pipe which extended above the roof of the building and through which vent the burned gases of the heater are permitted to escape into the outer air. The purpose of such a cap or wind deflector is to prevent rain from falling down the vent into the heater and to assist in preventing a down draft from extinguishing the flame of the burner. Whether this heater was so equipped we shall discuss later.
The exact size of the heater is not shown, but it appears that it was located in the very small bathroom in the half of the double cottage which was occupied by the mother and some of the children and that, though located on that side, it served to furnish hot water to the other side of the double cottage as well, so that whenever a hot water faucet was turned on on either side, the heater would be started.
The size of the room is referred to as being approximately four feet in width. However, the exact measurements are shown to have been 45 inches in width, 11 feet in length and 7 feet from the floor to the ceiling. In this room the.re was one window and one door and apparently no other openings though it does appear that the door did not fit its opening well and that there thus remained, even when the door was closed, cracks which afforded a total opening of about 36 square inches.
The mother is a deaf mute and no evidence could be obtained from her, though it is shown that she sent the four children into the bathroom to bathe together as was the custom. Sometime later, though how much later we cannot ascertain, the mother became alarmed and attempted to enter the room. In some manner she broke open the door and found the three older children on the floor unconscious and the youngest dead, though at that time the mother did not know this.
We cannot determine from the record just where the little girl was, though a neighbor who came over soon after said that the little girl was lying on the side of the tub and that her feet were in the water which was in the tub; that she was very wet and “her feet felt like she had boiled something.” When this neighbor, Edna. Thompson, and Herman Fulton, another neighbor came over, the air in the room-, was very hot and there was a tremendous, amount of condensation, referred to as sweating — “water was dripping from the-panes in the window which was closed.” Edna Thompson said that she “didn’t get to. see if the gas was on in there or anything,”' and Herman Fulton, the other neighbor, says that he “didn’t notice” gas.
Later two patrolmen, Lucien Cassard, Jr., and George Wilt, arrived from the crash or emergency squad and they made every effort to revive the little girl, but with no success. They said that the water in the tub was still hot, and apparently this was about an hour or an hour and a half after the occurrence. Edna Thompson said that the water was still running from the heater into the tub though she did not notice whether that water was hot. The two-police officers said that they noticed a “slight odor of gas fumes,” but when asked why they had not mentioned the gas in their report, admitted that they had not mentioned it but said that in those reports they did not go into detail. It seems to us that in that situation, whether or not gas was-in the room, was a most important detail..
*343 An autopsy was performed, and the report, called the “protocol”, convinces us that the death of the little girl was due to drowning and, while it is possible that the drowning had been preceded by asphyxiation, there is nothing in the report which indicates asphyxiation.
Dr. Stanley Durlacher, admittedly an expert in pathology and toxicology, the chief pathologist and toxicologist in the office of the Parish Coroner, who did not perform the autopsy but who later examined parts of some of the internal organs of the little girl, stated that the report indicated “death by drowning” and that the color of these specimens which were exhibited to him led him to believe that there had been no asphyxiation. He said that in the report there was no evidence of carbon monoxide. Dr. Durlacher said that •whenever there is asphyxiation from carbon monoxide, the internal organs which were ■exhibited take on a very noticeable cherry red color and that in this case there was no ■such color.
Dr. Durlacher also said that almost always when there is asphyxiation as the result of the inhaling of natural gas, there is vomiting. There was no vomiting by .any of the children.
The doctor was told the size of the room, ■the saturated condition of the air and of the water and the number of children who were in the room, and he was asked what might be the result of these conditions and he answered: “All those factors can produce conditions where people can be overcome and pass out. There is no question about it.” He also said: “People can pass ■out from a high humidity without it being necessarily a lack of oxygen at all. * * * I am answering that heat, high humidity and too high a concentration can certainly ■cause people to pass out.”
Dr. William H. Harris, Jr., a pathologist ■who testified on behalf of plaintiffs, was asked: “Children can be overcome from other causes than from gas, can they not?” He answered: “Yfes, sir!” He was shown a text book, apparently on the subject of asphyxiation and causes of unconsciousness, and was asked whether he agreed with the following statement which appeared therein:
“Fatalities have occurred among persons imprisoned in a small room closeted without ventilation, in such case asphyxiation is due as much to the insufficient oxygen supply as to excessive collection of carbon dioxide. It is likely that the heat, humidity and other deleterious effects produced by such confinement contribute to the fatal outcome.”
He answered:
“With that general statement, yes, sir, I would agree. I think the important part. of that statement is in the first part where it emphasizes a closed space, and I think that it takes a pretty good enclosure to deplete the available oxygen.”
When shown the protocol which, as we have already said, is the report of the autopsy, Dr. Harris said:
“There is nothing in this protocol to indicate that this individual could not have been overcome by inhalation of gas to the point of unconsciousness. There’s nothing in here at the same time that would indicate that asphyxia, which apparently was the cause of death, was due to inhalation of gas but rather that drowning was the direct cause of death.”
We have no difficulty in agreeing with the District Judge in his finding that the heater was defective, but we are not at all sure that it is shown with any reasonable certainty that the defects were the cause of the unfortunate accident. It is very evident that plaintiffs rely most on the charge .that the absence of a safety cutoff valve was probably the principal cause of the tragedy. Such a defect is a serious *344 one and makes the operation of such a heater extremely dangerous. But the evidence convinces us that the heater was burning certainly only a very short time before the children became unconscious. When the first neighbor entered the room the water in the tub was very hot and when the patrolmen arrived sometime later, they found it still hot. Since the water -was running when the first neigh-bo: entered the room, if the heater had not been burning, the water would have been cold and it would not have taken long for the cold water running into the tub to have made all the water cold or certainly it would not have been extremely hot as it was when the patrolmen arrived. Then, too, there was a tremendous amount of condensation in the room and the room also was very hot. If the heater had not been burning for quite sometime and the gas had been escaping, there would not have been the tremendous condensation which was found. If the heater was burning, the absence of the safety cutoff valve, while a dangerous defect, had nothing to do with this particular accident.
The contention that there was no down draft diverter on the heater is annihilated by the testimony of an expert witness produced by plaintiffs. This witness, Henry Buse, a graduate engineer, was placed on the stand to prove the defects in the heater, and yet when asked whether there was such a down draft diverter on this particular heater, which was in evidence in the courtroom, he said that there was such a down draft diverter which was built into the heater itself, and when asked: “There is nothing wrong with this down draft divert-er? he answered: “No, sir.”
It is possible that the evidence of another witness as to the absence of such a diverter was based on the fact that usually these diverters are placed above the heater and are easily noticeable, whereas this divert-er was built into the heater itself and was apparently overlooked by the witness who said that there was no such diverter in this heater.
There is some dispute as to whether there was a cap over the top of the vent pipe and it is shown that such a cap is required by the building code. However, the witness who testified that there was no such cap said that he had noticed its absence five days after the accident when he was called to make an inspection as a result of an explosion caused when the mother of the children attempted to light the burner with a match. The defendant, Tedesco, says that he is certain that there was such a cap and he suggests that it might have been blown off by the explosion five days after the occurrence on which this suit is based, and which explosion occurred before the inspection was made by the witness who says that there was no such cap. At any rate, here again we say that if there was no such cap, and it is complained that its absence might cause the burner to be extinguished, we feel that the evidence by no means demonstrates that the burner was not in operation or that its going out was the cause of this tragedy.
A detailed analysis of the testimony of every witness convinces us that it has not been shown by a preponderance of the evidence that the little girl whose death resulted from drowning was first asphyxiated or rendered unconscious as a result of defects in the water heater, or by any other condition for which the defendant landlord or his insurer may be held liable. We confess our inability to say definitely just what did cause the unconsciousness which no doubt preceded the drowning and it is possible, of course, that there was asphyxiation, but to so conclude from this record would be to indulge in speculation.
It is not necessary that there be proof beyond a reasonable doubt, but it is necessary that there be a preponderance of the evidence and where, as here, there is another explanation which is at least as *345 reasonable as is the claim of plaintiffs, we cannot allow the mere possibility to prevail.
In Orgeron v. Hourgettes, La.App., 67 So.2d 746, 747, in a somewhat similar situation in which it was claimed that a death had resulted from asphyxiation, we said:
“Under these circumstances we are unable to hold that Mrs. Orgeron’s death resulted from the asphyxiation or that her inhalation of the monoxide gas accelerated her death from the pre-existing heart ailment. If plaintiff is allowed to recover, the recovery would rest solely on conjecture.”
The judgment appealed from is affirmed at the cost of appellants.
Affirmed.