105 So.2d 264

Elsie **ELLSWORTH**, wife of and
Henry **DUNN**

v.

C. J. **TEDESCO** and American Fire and
Casualty Company.

No. 43488.

June 27, 1958.

Rehearing Denied Oct. 7, 1958.

Tucker & Schonekas, New Orleans, for plaintiffs-appellants.

D. A. McGovern, III, and Adams & Reese, New Orleans, for defendants-appellees.

HAWTHORNE, Justice.

This is a damage suit which the parents of an infant girl who drowned in the bathtub have brought against their landlord and his insurer. The basis of the defendants' liability was alleged by plaintiffs to be a defective bathroom heater which asphyxiated the baby and her brothers and sister who were in the bathroom with her. The district court denied recovery for the infant's death for the reason that it had not been proved that the baby had drowned as a result of inhaling fumes from the defective heater. On appeal the Court of Appeal for the Parish of Orleans affirmed the district court judgment on the ground that even if the little girl had drowned as a result of losing consciousness, the evidence produced at the

trial did not show with reasonable certainty that her loss of consciousness was due to defects in the heater. La.App., 93 So.2d 339. We granted certiorari, but have decided that the record in this case supports the lower court judgments.

On December 4, 1953, the date of the accident, Elsie Dunn, who was separated from her husband, Henry Dunn, was living with their children at 1726 St. Anthony Street in New Orleans, in half of a double cottage which she rented from C. J. Tedesco. The bathroom of this cottage, in which the infant drowned, had been built on part of a back porch, the bathroom door opening out onto the rest of the open porch. This bathroom was small, being 45 inches wide, 11 feet long, and 7 feet high, and contained two openings, a window and the above mentioned door, both of which were closed when the accident happened. In this small bathroom was an instantaneous coil-type water heater. The large burner on this heater was automatically turned on when any hot water faucet was opened, and as gas entered the large burner, it was ignited by a constantly burning pilot light. Plaintiffs alleged that this heater was defective in three respects: (1) There was no safety pilot cutoff, (2) there was no vent cap, and (3) there was no proper down-draft diverter. The New Orleans Building Code requires that such a heater be equipped with all these devices.

The purpose of a safety pilot cutoff is to shut off the main gas supply in case the hot water faucet is turned on when the pilot light is out. In other words, this device prevents raw or unburned gas from escaping when the pilot light is not burning. It is conceded and admitted that the heater in question had no such safety pilot cutoff, and that it was defective in this respect.

A vent cap is a metal cap or hood placed on the top of the vent pipe, which extends above the roof of the building and through which burnt gases of the heater are permitted to escape into the outer air. The purposes of this vent cap are to prevent rain from falling down the vent into the heater, to keep a down draft from blowing out the pilot light of the heater, and to assist in creating a draft up the vent pipe so as to discharge the combustion products of the heater into the outer air.

The down-draft diverter also tends to prevent the pilot flame in the heater from being put out by a down draft. As to this alleged defect we might as well say here that there was a down-draft diverter on this particular heater. Plaintiffs' witness Henry Buse, a heating expert, admitted that this particular heater, which had been brought into the courtroom, had a built-in draft diverter, the purpose of which, as stated, was to prevent back draft and to improve the up draft. Since plain-

tiffs have not shown that this alleged defect existed, we shall not discuss it further.

The instant suit is based on Articles 670 and 2322 of the Louisiana Civil Code, which place a duty on the owner of a building to keep his premises in repair and make him answerable for damage either occasioned by its ruin when caused by his neglect to repair it or resulting from a vice in its original construction. In order to succeed in this action these plaintiffs would have had to show by a preponderance of the evidence that the heater was defective and that its defects caused or contributed to their infant daughter's death.

On the afternoon of the baby's death, Henry Dunn III, aged six years 11 months, Roy Dunn, aged five, Marilyn Dunn, aged three, and Carol Dunn, aged two—the little girl who drowned—, were bathing alone in the above described bathroom. How long the children were alone by themselves in the little room, whether they drew their bath themselves or it was drawn by their mother, how many of the children were in or out of the tub when last seen by their mother, when the bathroom door was closed and by whom—none of this is shown by the record in this case. The curtain went up on this tragedy when a neighbor, Edna Thompson, heard Mrs. Dunn knocking on the bathroom door of the half-cottage next door, went to the fence separating the two houses, and signaled to the mother, a deaf-mute, that her children were crying, whereupon Mrs. Dunn indicated by a sign that the children were bathing and Edna Thompson went back inside her own house. A little later Edna Thompson heard Mrs. Dunn screaming, so she jumped the fence and rushed to the little bathroom next door, where she found three of the youngsters lying unconscious on the floor and the baby lying on the side of the tub, also unconscious. Water was still running into the tub. In describing the scene at the trial this witness for plaintiffs said: " * * * The baby in the tub was laying on the side of the tub. She had been in the water so long, her feet felt like she had boiled something. She was very long in the tub." And further on in her testimony this witness stated: "The bathroom was hot. * * * They had water in the tub, how much it was, I don't know. * * * The water must have been hot. It was real hot in there. It was so hot all the glass was sweating." When questioned again as to the appearance of the child whose feet were in the tub, this witness answered: "Look like a drowned person and like a person who had been in the water a long time."

No odor of gas in the bathroom was noticed by this first arrival on the scene, or by the second comer, another neighbor, Herman Fulton, nor was any mention made of there being gas in the room in the report made by the two patrolmen who

were the third and fourth outsiders to arrive in the house, although at the trial the latter testified that they had smelled gas in the bathroom that day but that this had not led them to check the heater to see whether the pilot was lit or not. We are impressed by the fact that these same patrolmen found the water in the bathtub to be still hot an hour and a half after they arrived at the cottage.

The neighbors and the patrolmen were able to revive the three older children who had been found unconscious on the floor, but the baby of two was pronounced dead by a Charity Hospital doctor after the two patrolmen had administered artificial respiration without success for an hour and a half. The autopsy protocol prepared by the Orleans Parish coroner's office reads: "Carolyn Dunn. * * * Death due to drowning."

The Court of Appeal gave very careful consideration to all the testimony and evidence adduced in this case, and granted plaintiffs a rehearing so that it might give even further study and consideration to. the case.[1] In both instances that court held that it had not been shown by a preponderance of the evidence that the little girl whose death resulted from drowning was first asphyxiated or rendered unconscious as a result of defects in the water heater, or by any other condition for which the defendant landlord or his insurer may be held liable. La.App., 93 So.2d 339, 344.

As we have previously stated, it is conceded and admitted here that the heater in question had no safety pilot cutoff. Consequently the first question is whether the absence of this safety device permitted raw or unburned gas to escape into the bathroom and asphyxiate these children. If so, it would be unreasonable to conclude that asphyxiation did not contribute to the death of the baby by drowning. The record is convincing, however, that there was no escape of raw gas into the bathroom.

No appreciable amount of hot water comes out of a coil-type heater when the main burner underneath the coils is not lit. We have already discussed the evidence in this case given by the neighbors and the patrolmen, to the effect that water was running into the tub from the faucet when the first arrival entered the bathroom, that the drowned infant's feet were boiling hot, that the room itself was so hot that the glass was sweating, and that the water in the bathtub was still hot a couple of hours after the children were removed from the room. This accident took place in December, and the weather was

1. The opinion on original hearing was written by Judge Janvier, and that on rehearing by Judge McBride. Judge Regan dissented both on first hearing and on rehearing.

cool. If the hot water faucet had been turned on when the pilot was out, cold water would have poured into the tub while gas from the main burner was filling the room, and neither the water nor the room would have been excessively hot—in fact, the water in the tub would have been cool. Moreover, neither of the two neighbors, who were the first two arrivals at the scene of the accident, noticed any odor of gas in the bathroom.

On original hearing the Court of Appeal with reference to this point had this to say [93 So.2d 343]:

"* * * It is very evident that plaintiffs rely most on the charge that the absence of a safety cutoff valve was probably the principal cause of the tragedy. Such a defect is a serious one and makes the operation of such a heater extremely dangerous. But the evidence convinces us that the heater was burning certainly only a very short time before the children became unconscious. When the first neighbor entered the room the water in the tub was very hot and when the patrolmen arrived sometime later, they found it still hot. Since the water was running when the first neighbor entered the room, if the heater had not been burning, the water would have been cold and it would not have taken long for the cold water running into the tub to have made all the water cold or certainly it would not have been extremely

hot as it was when the patrolmen arrived. Then, too, there was a tremendous amount of condensation in the room and the room also was very hot. If the heater had not been burning for quite sometime and the gas had been escaping, there would not have been the tremendous condensation which was found. If the heater was burning, the absence of the safety cutoff valve, while a dangerous defect, had nothing to do with this particular accident."

On rehearing the Court of Appeal said on this same point:

"Under the circumstances as appear from the record, we can hardly conceive that the pilot light was ever extinguished so that unburned gas flowed into the small room for the simple reason, as we stated before, that the water heater is an instantaneous one and the moment there was no flame to heat the coils, the flow of hot water was not possible. When the members of the police force arrived at the premises some time after the accident, they found the water in the tub was still hot, and if cold water had been flowing from the heater as a result of the extinguishment of the pilot, it is an axiomatic fact that this would have manifested itself by making the water in the tub cold. The police officers say the water was extremely hot. Another fact is that the neighbor who rushed into the bathroom almost im-

mediately after the room was broken into stated there was no odor of gas.

\*   \*   \*   \*   \*   \*

"We are absolutely certain from the evidence before us that the child's death under investigation did not occur as a result of escaping natural gas, and we rule that out as a cause."

The next question is whether plaintiffs have established that the heater was defective in that there was no vent cap on top of the vent pipe which extended above the roof of the building, and that this defect caused or contributed to the child's death.

C. J. Tedesco, the owner of the leased premises, testified positively that there had been a vent cap on the end of the vent pipe at the time the heater was installed. On the other hand, there is evidence by a deputy fire marshal, who examined the premises five days after this accident, that there was then no vent cap on the vent pipe in question. However, even if we adopt the view most favorable to plaintiffs and assume that there was no vent cap on the vent pipe on the day of the accident, there is no evidence in this record that this defect contributed to the asphyxiation of the children.

The purposes of this vent cap, as we have stated, are to keep a down draft from blowing out the pilot light of the heater,

to prevent rain from falling down the vent pipe into the heater, and to assist in creating a draft up the vent pipe. As already said, the pilot light in this heater had not been extinguished and hence there was no flow of unburned natural gas into the room. We have therefore to consider only the question of the relation of the lack of a vent cap to the ventilation of the bathroom.

One of plaintiffs' expert witnesses, who testified that one of the purposes of this vent cap when the heater was burning was to assist in creating a draft, stated that if there was not sufficient draft, some of the products of combustion—carbon dioxide, water vapor, and carbon monoxide—might escape into the room. However, the possibility of the baby's asphyxiation by carbon monoxide is positively ruled out. A deputy coroner who examined certain tissues removed from the child's body at the time of the autopsy testified that these tissues were not of a cherry-red color as they would have been had the child been asphyxiated by breathing carbon monoxide.

As said before, there was a vent pipe extending from this heater above the roof. The fact that the absence of a vent cap *might*, as testified by one of plaintiffs' experts, have caused some of the products of combustion to escape into the room is not sufficient basis for a conclusion that there was a causal connection between this de-

fect in the heater and the death of the child, particularly when we consider that the drowned infant was not asphyxiated by carbon monoxide, one of the products of combustion. If plaintiffs were permitted to recover solely because of the absence of the vent cap, recovery would rest entirely on conjecture and speculation.

As we stated earlier in this opinion, there is nothing in the record in this suit which even suggests how long the Dunn children were shut up in the bathroom with the hot water running, but we do know that the place was excessively hot and moist when the door was opened. Defendants' witness, Dr. Stanley H. Durlacher, professor of pathology at Louisiana State University and chief pathologist at the New Orleans coroner's office, testified at the trial of this case that heat, high humidity, and restricted quarters can cause unconsciousness.

After a careful analysis of all the evidence and testimony, there is no conclusion that we can reach except that plaintiffs have not proven or established to our satisfaction by a preponderance of the evidence that a defect in the heater caused or contributed to the death of their child, and hence they cannot recover.

For the reasons assigned the judgment of the Court of Appeal is affirmed, plaintiffs to pay all costs.